758 F.2d 137
 23 ERC 1223, 12 Collier Bankr.Cas.2d 762,
Bankr. L. Rep. P 70,352
 SOUTHERN RAILWAY COMPANY
v.
JOHNSON BRONZE COMPANY, Debtor. South Carolina Department
of Health and Environmental Control and Perry
Machinery Corporation.
Appeal of JOHNSON BRONZE COMPANY, No. 84-3280.
Appeal of PERRY MACHINERY CORPORATION, No. 84-3317.
In re JOHNSON BRONZE COMPANY, Debtor, Southern Railway
Company, Plaintiff.
JOHNSON BRONZE COMPANY, South Carolina Department of Health
and Environmental Control, Perry Machinery
Company, Defendants,
v.
The COMMITTEE OF UNSECURED CREDITORS, Intervenor.
Appeal of The COMMITTEE OF UNSECURED CREDITORS OF the
JOHNSON BRONZE COMPANY.
 Nos. 84-3280, 84-3317 and 84-3318.
 United States Court of Appeals,
Third Circuit.
 Argued March 4, 1985.
Decided April 2, 1985.
 
 Burt DeRieux, Eileen M. Crowley (argued), David M. Holliday, Greene, Buckley, DeRieux & Jones, Atlanta, Ga., for Southern Ry. Co.
 Robert G. Sable (argued), F. Scott Gray, Lampl, Sable & Makoroff, Pittsburgh, Pa., for Johnson Bronze Co.
 William H. Schorling, James A. Bollenbacher, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for the Committee of Unsecured Creditors.
 Jay G. Ochroch, Leonard P. Goldberger (argued) Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., for Perry Machinery Corp.
 Before GIBBONS, Circuit Judge, and FULLAM and SCHWARTZ, District Judges*.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge:
 
 
 1
 This appeal arises out of an adversary proceeding in the bankruptcy court. Southern Railway Company (Southern) commenced that proceeding by seeking a declaratory judgment that the debtor, Johnson Bronze Co., (Johnson) and the debtor's successor in title, Perry Machinery Corp. (Perry) are jointly and severally liable for the cost of cleanup of a drainage ditch on Southern's property containing sludge generated by the debtor's pre-petition manufacturing operations. Perry cross-claimed against the debtor, not only for any liability it might have for the cost of cleanup of the drainage ditch, but also for the cost of removing the sludge from the plant site acquired from the debtor. Perry also filed a claim for administrative priority for the money it expended in cleaning the site. The bankruptcy court held that Southern had a lien against the proceeds of sale of the plant site for the cost of cleaning the ditch on Southern's property; that Perry was not liable to Southern for the cost of cleanup of the ditch, and that Perry had no claim, administrative or otherwise, against the debtor's estate for the cost of cleanup of the plant site. The debtor and the Committee of Unsecured Creditors, an intervenor, appealed to the district court from the order imposing a lien in favor of Southern. Perry appealed to the district court from the order denying its claim. The district court affirmed, and the same parties appealed to this court. We reverse the order imposing a lien in favor of Southern, and affirm the order denying Perry's claim against the debtor's estate.
 
 I.
 Factual Background
 
 2
 Johnson, a bearing manufacturer, prior to filing its Chapter 11 petition, operated plants in New Castle, Pennsylvania and Summerville, South Carolina. The Summerville plant was occupied by Johnson as sublessee under a long-term revenue bond lease from Dorchester County, South Carolina to Desley Fabrics, Inc. which assigned its rights under the lease to PRF Corporation, Johnson's sublessor. In order to operate the Summerville plant, Johnson, as assignee from the previous tenant, acquired a license from Southern to dispose of sewage in a drainage ditch on Southern's adjacent right-of-way. That ditch flows downstream to Rumph's Hill Creek, which empties into the Ashley River. Discharge into the river, and hence into the ditch, is governed by the South Carolina Pollution Control Act, S.C.Code Ann. Sec. 44-56-10 et seq. (Law. Co-op 1976), and the South Carolina Hazardous Waste Management Act, id. Sec. 44-56-10 et seq. The license requires that Johnson maintain the ditch, restore it to its original condition, and indemnify Southern for any liability arising from its use.
 
 
 3
 In the course of its manufacturing operation, Johnson generated hazardous industrial wastes, some of which were separated from its waste stream in a settlement pond, and stored on the leasehold premises. Some of the waste was discharged into Southern's drainage ditch. In April, 1980 the South Carolina Department of Health and Environmental Control (SCDHEC) held a show cause conference with Johnson, which led to a consent order for the cleanup of Johnson's environmental violations. Before that order was complied with, however, Johnson ceased operations at the Summerville plant, and on August 19, 1980 filed a voluntary Chapter 11 petition.
 
 
 4
 On January 13, 1981 Johnson, as debtor in possession, sought the bankruptcy court's permission to sell its interest in the Summerville plant and equipment, as well as certain equipment in Pennsylvania, in a private sale to Perry, a company engaged in the business of liquidating industrial plants. Notice of the sale was given to secured creditors and to the Committee of Unsecured Creditors. No notice was given to PRF Corporation, Southern, or SCDHEC. Johnson apparently did not inform the bankruptcy court of the environmental violations or of SCDHEC's interest in abating them.
 
 
 5
 Before Perry made its offer to purchase the Summerville plant, a Perry representative, James Strickler, inspected the site. He was allowed unlimited access to the entire facility. At the time of his inspection there were green and white sludge piles measuring 6 feet by 20 feet on the leasehold, and the settlement pond was green and white in color from the waste.
 
 
 6
 The sale to Perry for almost $2,000,000 was confirmed by order dated January 21, 1981. Perry was to obtain an assignment of Johnson's sublease. When PRF, the sublessor, learned of the proposed assignment, it sought to have the transaction set aside as it was affected without the sublessor's approval. As a result of negotiations, it was agreed that Perry would assume all the rights and liabilities of Johnson under the revenue bond lease, and that Perry would cause the waste material stored on the leasehold to be removed at no cost to PRF. No reference was made in this agreement to the waste in Southern's ditch. The court approved the PRF-Johnson-Perry arrangement on June 16, 1981. Meanwhile, on February 21, 1981, Joel Cooper, the President of Johnson, wrote to Perry that Johnson would assume full responsibility for the cost of removing the sludge. This letter was sent without approval of the bankruptcy court, and no such undertaking was included in the arrangement approved by that court on June 16, 1981. The assignment of the sublease was executed on March 17, 1981.
 
 
 7
 By the time of the June 16, 1981 approval of the PRF-Johnson-Perry arrangement, SCDHEC had commenced administrative enforcement proceedings against Perry and Southern. Perry removed the sludge from the leasehold premises at a cost of $129,444.08. Southern filed in the bankruptcy court the petition for a declaratory judgment which resulted in these appeals.[1]
 
 II.
 Southern's Claim
 
 8
 It is not disputed that Johnson undertook, in the license agreement which permitted it to use the ditch, to indemnify Southern, and thus that Southern is at least a general unsecured creditor for the cost of the cleanup. Southern seeks, however, to impose the cost of cleanup of its drainage ditch either upon Perry, or by way of an administrative priority, upon Johnson.
 
 A.
 Against Perry
 
 9
 While Johnson, in the course of the sale to Perry, assigned the sublease from PRF Corporation to Perry, it did not assign the drainage license, and Perry, therefore, assumed no obligations with respect to that license. The bankruptcy court credited the testimony of Perry's agent that when he visited the site he did not see any evidence of the ditch. Thus, there is no basis on which any express or implied contractual obligation running from Perry to Southern could be found. Perry's interest in the leasehold might be subject to a lien securing the indemnity agreement had its predecessor so burdened the property, but the indemnity agreement in the license did not so provide. Moreover, Southern has not referred us to any South Carolina law which would impose a lien on the leasehold in its favor. Thus the bankruptcy court properly held that Southern has no claim against Perry.
 
 B.
 Against the Debtor's Estate
 
 10
 The bankruptcy court held that despite Southern's unsecured status, it would be granted a lien against the proceeds of the Johnson-Perry sale for the cost of cleaning its ditch. In reaching this result the bankruptcy court relied upon its equity powers under section 105(a) of the Bankruptcy Code, which provides that "[t]he bankruptcy court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. Sec. 105(a) (1982). It found an "equity" in Southern's favor in that Southern had not received notice of the intended sale to Perry, and thus had lost the opportunity to object to that sale prior to its consummation. Rather than set the sale aside, the court took what it regarded as the "less dislocat[ing]" step of imposing a lien on the proceeds. App. 83.
 
 
 11
 We conclude that the notice which preceded the sale to Perry was legally sufficient. The debtor in possession had the powers of a trustee. 11 U.S.C. Sec. 1107(a) (1982). Thus it, had the power to sell estate property other than in the ordinary course of business after "notice and a hearing". Id. Sec. 363(b). Section 102(1) provides:
 
 
 12
 (1) "[A]fter notice and a hearing", or a similar phrase--
 
 
 13
 (A) means after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances....
 
 
 14
 Id. Sec. 102(1)(A). Bankruptcy Rule 2002(i) provides that when property is to be sold other than in the ordinary course of business the court "may order that notices ... be mailed only to the committees or their authorized agents and to the creditors and equity security holders who file with the court a request that all notices be mailed to them." Notice of the Johnson-Perry sale was given to the Committee of Unsecured Creditors, and Southern, as a creditor, had not filed with the court a request that it receive all notices. Thus, the notice procedure resorted to in connection with the Sec. 363(b) sale was sufficient under the Bankruptcy Code and Rules.
 
 
 15
 Perhaps Sec. 105(a) which confers equity powers upon the bankruptcy court affords authority to provide some form of relief to a creditor who can show prejudice flowing from a failure to receive notice in the course of a proceeding which conforms to the requirements of Rule 2002(i), but section 105(a) does not authorize the bankruptcy court to create rights not otherwise available under applicable law. As this court observed with respect to the equitable powers of the bankruptcy courts functioning under the Bankruptcy Act of 1898,
 
 
 16
 [t]he court may not by granting a priority which it deems equitable set aside the clear congressional mandate that no such priority shall be accorded. Pepper v. Litton, 308 U.S. 295 [60 S.Ct. 238, 84 L.Ed. 281] ... is not to the contrary. That case holds that a court of bankruptcy under its equitable powers may disallow or subordinate a particular claim in bankruptcy which, because of the fraudulent nature of the claim or the bad faith or improper conduct of the claimant, ought not in equity and good conscience to be allowed or paid on a parity with other claims. It does not hold that the court may set up a sub-classification of claims within a class given equal priority by the Bankruptcy Act and fix an order of priority for the sub-classes according to its theory of equity.
 
 
 17
 In re Columbia Ribbon Co., 117 F.2d 999, 1002 (3d Cir.1941). Accord, In re B & W Enterprises, 713 F.2d 534, 537 (9th Cir.1983).
 
 
 18
 Southern seeks to have its contractual indemnification claim against Johnson treated as somehow superior to the claims of other general unsecured creditors. Its claim is not afforded priority under 11 U.S.C. Sec. 507 (1982); thus equality of treatment is the applicable standard. Indeed, the only basis which it suggests for such preferential treatment is that because SCDHEC has sought to force it to clean up the drainage ditch it should be subrogated to the rights, against Johnson, of SCDHEC. Assuming without deciding that there is some legal basis for the recognition of such a subrogation right, it can rise no higher than that of SCDHEC. In Ohio v. Kovacs, --- U.S. ----, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985) the Supreme Court held that Ohio's injunction directing the cleanup of a hazardous waste site was no more than a general unsecured claim. In this case, South Carolina's administrative order had not even been reduced to judgment. Thus, the claim to which Southern seeks to be subrogated, a general unsecured claim, in no way improves its priority.
 
 
 19
 Southern urges that this court's decision in In re Quanta Resources Corp., 739 F.2d 912 (3d Cir.1984), cert. granted sub nom. O'Neil v. City of New York, --- U.S. ----, 105 S.Ct. 1168, 83 L.Ed.2d --- (1985), its companion case of the same name, 739 F.2d 927 (3d Cir.1984), cert. granted sub nom. Midlantic National Bank v. New Jersey Department of Environmental Protection, --- U.S. ----, 105 S.Ct. 1168, 83 L.Ed.2d --- (1985) and Penn Terra Ltd. v. Department of Environmental Resources, 733 F.2d 267 (3d Cir.1984) require affirmance. Reliance on those cases is misplaced. Penn Terra decided only that the automatic stay provision in 11 U.S.C. Sec. 362 did not bar an injunction action by the Commonwealth of Pennsylvania to enforce its environmental protection statutes. No such issue is presented in this case. Indeed South Carolina did proceed with enforcement actions against Perry and Southern, and has not sought anything from the debtor's estate. Thus, Penn Terra does not deal with the priority to be afforded to a claim against the estate for the cost of an environmental cleanup. In Quanta Resources the majority held that a trustee could not abandon property subject to a cleanup injunction, but expressly declined to reach the issue of priority, if any, to be afforded a claim for the cost of cleanup. 739 F.2d at 923, 929. Since those decisions, the Supreme Court has spoken definitively on the priority question in Ohio v. Kovacs, supra, and that case controls. The bankruptcy court had no authority to elevate Southern's general unsecured contract indemnity claim to the status of a claim secured by a lien on the proceeds of the sale from Johnson to Perry.
 
 III.
 Perry's Claim
 
 20
 Perry advances several arguments for treating its claim for the cost of cleanup of the leasehold premises as an administrative claim under section 503 having a first priority under 11 U.S.C. Sec. 507 (1982). Perry's first argument is that Johnson's failure to disclose the existence of a hazardous waste problem amounted to fraud. The bankruptcy court rejected Perry's fraud claim, finding that Johnson had made no misrepresentation; that the sludge piles were not concealed, and that Perry had actual notice of the existence of the sludge and the condition of the pond. The court found that under the circumstances Perry, an experienced buyer and seller of industrial sites, should have made additional inquiries. These findings are not clearly erroneous, and they preclude any common law fraud claim.
 
 
 21
 Perry urges, however, that the common law standards for fraud should not apply because it was in a fiduciary relationship with the debtor in possession and that this created an affirmative obligation on the part of Johnson to disclose. In support of that contention Perry refers us to cases holding that a trustee or a debtor in possession in a reorganization proceeding is a fiduciary.[2] No doubt a trustee, or a debtor in possession, is in a fiduciary relationship with creditors of the estate. It does not follow, however, that the same special relationship exists between trustees or debtors in possession and those with whom they deal at arm's length on behalf of the estate. Nothing in the Johnson-Perry contractual relationship gave rise to a special relationship which would impose on Johnson a greater duty of disclosure than that imposed by the common law of fraud.
 
 
 22
 Next, Perry urges that the promise made on February 21, 1981 by Joel Cooper, Johnson's president, that Johnson would assume full responsibility for the cost of removing the sludge, should be enforced on a theory of promissory estoppel. The bankruptcy court noted that it had approved the terms of the Johnson-Perry sale out of the ordinary course of business on January 21, 1981, and that under 11 U.S.C. Sec. 362 the debtor in possession lacked authority to modify those terms without court approval. Moreover, the court found that Perry consummated the transaction without advising the court of any environmental problem or attempting to avoid the sale.
 
 
 23
 The elements of promissory estoppel recognized by South Carolina are:
 
 
 24
 (1) the presence of a promise unambiguous in its terms; (2) reasonable reliance upon the promise by the party to whom the promise is made; (3) the reliance is expected and foreseeable by the party who makes the promise; and (4) the party to whom the promise is made must sustain injury in reliance on the promise.
 
 
 25
 Powers Construction Co., Inc. v. Salem Carpets, Inc., --- S.C. ---, 322 S.E.2d 30, 33 (S.C.App.1984). Mr. Cooper's promise is unambiguous, but it could not have reasonably been relied upon by Perry, an experienced purchaser of industrial plants in bankruptcy and reorganization cases, which knew that the terms of sale had been approved by the court prior to the date of Cooper's promise. Whether Cooper expected and foresaw reliance is hardly relevant, since neither the bankruptcy court nor the other creditors expected or foresaw such reliance. Moreover Perry's going forward with the transaction after becoming aware of the environmental problem suggests that it did not rely on Cooper's promise, but rather was motivated by the profits it expected to make in liquidating the Summerville plant. Thus, the bankruptcy court did not err in rejecting Perry's promissory estoppel claim.
 
 
 26
 Finally, Perry urges that Quanta Resources and Penn Terra require the recognition of its claim as a cost of administration. This contention is without merit. As we note in Part II above, neither of those case rules on the priority to be afforded to claims for cleanup costs incurred in compliance with state environmental protection laws. The relevant case is Ohio v. Kovacs, --- U.S. ----, 105 S.Ct. 705, 711 n. 12, 83 L.Ed.2d 649 (1985) in which the court observed:
 
 
 27
 If the site at issue were [the debtor's] property, the trustee [or debtor in possession] would shortly determine whether it was of value to the estate. If the property was worth more than the costs of bringing it into compliance with state law, the trustee [or debtor in possession] would undoubtedly sell it for its net value, and the buyer would clean up the property, in which event whatever obligation [the debtor] might have had to clean up the property would have been satisfied. If the property were worth less than the cost of cleanup, the trustee [or debtor in possession] would likely abandon it to its prior owner, who would have to comply with the state environmental law to the extent of his or its ability. (emphasis supplied). In this case the debtor in possession opted to sell, and Perry, as purchaser, acquired the leasehold subject to the cleanup obligation.
 
 IV.
 
 28
 In No. 84-3280 the judgment in favor of Southern will be reversed. In Nos. 84-3317 and 84-3318 the judgment in favor of Johnson will be affirmed.
 
 
 
 *
 Hon. John P. Fullam, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 Hon. Murray M. Schwartz, United States District Judge for the District of Delaware, sitting by designation.
 
 
 [1]
 Southern also sought an order that SCDHEC must proceed against Johnson and Perry before proceeding against Southern. A motion by SCDHEC to dismiss was granted. The order granting that motion was not appealed
 
 
 [2]
 Perry cites In re Combined Metals Reduction Co., 557 F.2d 179, 196-197 (9th Cir.1977), Sherr v. Winkler, 552 F.2d 1367, 1374 (10th Cir.1977) and Moulded Products, Inc. v. Barry, 474 F.2d 220 (8th Cir.), cert. denied, 412 U.S. 940, 93 S.Ct. 2779, 37 L.Ed.2d 400 (1973)